IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Janis Denise Webb, | ) | C/A No.: 1:16-267-PMD-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards.[1] For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

---

[1] Plaintiff also filed a motion to admit new evidence [ECF No. 13], which the undersigned addresses herein.

I.    Relevant Background

    A.    Procedural History

On August 29, 2012, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on August 4, 2012. Tr. at 162–65 and 453. Her applications were denied initially and upon reconsideration. Tr. at 156–57 and 454–58. On March 17, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Alice M. Jordan. Tr. at 511–80 (Hr'g Tr.). The ALJ issued an unfavorable decision on September 18, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 23–41. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 8–10. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on January 28, 2016. [ECF No. 1].

    B.    Plaintiff's Background and Medical History

        1.    Background

Plaintiff was 47 years old at the time of the hearing. Tr. at 529. She completed high school and vocational training in medical billing and coding. Tr. at 530. Her past relevant work ("PRW") was as a medical billing clerk, a hospital admissions clerk, a retail sales clerk, a bookkeeper, a certified nursing assistant ("CNA"), and a motel clerk. Tr. at 569–70. She alleges she has been unable to work since May 29, 2012.[2] Tr. at 26.

---

[2] Plaintiff's attorney amended her alleged onset date in a letter dated March 11, 2014. Tr. at 192.

2.    Medical History

On August 4, 2011, Plaintiff reported having had no seizures since February. Tr. at 341. She complained of depression, appetite disturbance, and right hand pain. *Id.* Neurologist George Timothy Baxley, M.D. ("Dr. Baxley") indicated Plaintiff had intact sensation, except at the right median nerve distribution. *Id.* He observed Plaintiff to have right hand grasp weakness and positive Tinel's and Phalen's signs on the right. *Id.* He administered an injection to Plaintiff's right hand. *Id.* Dr. Baxley indicated Plaintiff was wearing a brace for carpal tunnel syndrome and may need nerve conduction studies ("NCS"). *Id.* He stated "[i]n my opinion, she cannot engage in gainful employment due to her number of maladies." *Id.*

On October 14, 2011, Plaintiff complained of left hip pain to her provider at the Rosa Clark Clinic. Tr. at 298. An x-ray of Plaintiff's left hip showed mild degenerative spurring. Tr. at 290.

Dr. Baxley indicated he was concerned that Plaintiff was developing a cervical myelopathy on November 3, 2011. Tr. at 340. He observed Plaintiff to have left circumduction of her gait and hand grasp weakness. *Id.* He recommended electromyography ("EMG") and NCS of Plaintiff's neck, left sacroiliac region, and bilateral carpal tunnels and indicated he would consider magnetic resonance imaging ("MRI") of her cervical spine. *Id.*

Plaintiff presented to Eye and Contact Lens Associates for an eye examination on November 11, 2011. Tr. at 272–76. She was diagnosed with left optic nerve atrophy and bilateral myopia (nearsightedness), astigmatism, and presbyopia. Tr. at 276. The provider

noted Plaintiff's optic nerve "looked the same as before" and indicated her vision was stable. *Id.* He prescribed new glasses. *Id.*

On November 18, 2011, Plaintiff complained of cloudy urine and increased urinary frequency. Tr. at 297. Her provider at the Rosa Clark Clinic diagnosed a urinary tract infection and prescribed Cipro. *Id.*

Dr. Baxley performed EMG and NCS on December 6, 2011. Tr. at 343. He indicated the bilateral L4 and C5 paraspinals showed distant fibrillations for EMG sampling. *Id.* He indicated NCS were negative and normal and the left SI joint was normal on the EMG studies. *Id.* He stated the findings were consistent with a bilateral mid-cervical and bilateral lower lumbar radiculopathy, but there was no evidence for carpal tunnel syndrome on either side. *Id.* He indicated Plaintiff had improved and should continue to follow up with Michael J. Ezell, D.C. ("Dr. Ezell"), for treatment. *Id.*

Plaintiff presented to the emergency room ("ER") at Oconee Medical Center, after having injured her right ankle on December 15, 2011. Tr. at 282. She stated she fell while climbing stairs. *Id.* An x-ray showed no evidence of fracture or dislocation. Tr. at 287. The attending physician diagnosed an ankle sprain. Tr. at 285.

On April 9, 2012, Plaintiff and her husband reported that she had a seizure on the prior Friday evening. Tr. at 338. Dr. Baxley indicated Plaintiff may be having some sleep myoclonus. *Id.* Plaintiff continued to report swelling in her right foot and knee from the fall she sustained in December. *Id.* On physical examination, Dr. Baxley noted "[n]o edema other than mechanical edema with crepitus at the right knee and osteoarthritic-type swelling of the right ankle." *Id.* He recommended Plaintiff undergo an

electroenchaphalogram ("EEG") and MRI of her brain and consult with an orthopedist. Tr. at 338–39.

On May 10, 2012, the EEG was normal. Tr. at 279. The MRI of Plaintiff's brain showed bilateral, essentially symmetric, areas of subcortical white matter and cortical hyperintensity that were adjacent to some areas of localized cortical atrophy in the bilateral frontal lobes and posterior occipital parietal regions. Tr. at 280. The radiologist indicated he was uncertain as to the significance of the findings, but stated they may reflect sequelae of vasculitis or hypotensive ischemia with likely old chronic insults at the affected sites. *Id.*

On May 29, 2012, Plaintiff complained to her provider at the Rosa Clark Clinic that she had been falling a lot and had injured her right knee. Tr. at 296. The provider encouraged her to follow up with Dr. Baxley. *Id.*

On June 22, 2012, an MRI of Plaintiff's right foot showed mildly increased T2 signal within the proximal aspect of the second metatarsal and within the cuneiforms that could represent edema from bone bruising, as well as scattered areas of joint effusion about the foot and ankle. Tr. at 277. An MRI of Plaintiff's right knee showed a popliteal cyst and a small joint effusion. Tr. at 278.

Plaintiff followed up with James C. McGeorge, M.D. ("Dr. McGeorge"), to discuss the MRI results on June 25, 2012. Tr. at 293. Dr. McGeorge indicated the MRI showed a popliteal cyst, but did not indicate any meniscal injury. *Id.* He observed Plaintiff to have mild effusions, but no increased warmth or erythema. *Id.* He administered a steroid injection. *Id.*

5

On July 9, 2012, Dr. Baxley indicated Plaintiff was doing better and that her swelling had improved. Tr. at 337. He stated a recent EEG was normal and an MRI showed no change. *Id.* He instructed Plaintiff to follow up in six months. *Id.*

Plaintiff complained of urinary incontinence on September 9, 2012. Tr. at 295. She indicated her right leg was swelling and that her back pain had increased since she sustained the fall in December. *Id.* The provider observed Plaintiff to be tender to palpation in her lumbosacral spine. *Id.*

On September 10, 2012, Plaintiff complained of pain and swelling in her right leg and knee. Tr. at 292. Dr. McGeorge observed Plaintiff to have mild effusion, increased warmth, and erythema. *Id.* He administered a steroid injection. *Id.*

State agency medical consultant Dale Van Slooten, M.D. ("Dr. Van Slooten"), reviewed the record and assessed Plaintiff's residual functional capacity ("RFC") on October 16, 2012. Tr. at 130–32. He found that Plaintiff could occasionally lift and/or carry 20 pounds; could frequently lift and/or carry 10 pounds; could stand and/or walk for about six hours in an eight-hour workday; could sit for about six hours in an eight-hour work day; could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; could never climb ladders, ropes, or scaffolds; and should avoid even moderate exposure to hazards. *Id.* On February 11, 2013, state agency medical consultant William Crosby, M.D., assessed the same limitations. Tr. at 145–47.

Plaintiff presented to Robin L. Moody, Ph. D., LPC ("Dr. Moody"), for a mental status examination on October 22, 2012. Tr. at 308. She indicated she felt depressed because three of her family members had passed away within the year and one of her

friends was in the intensive care unit. Tr. at 308–09. She stated she slept at night and during the day for a total of nine to 10 hours. Tr. at 309. She indicated she socialized with members of her church. *Id.* She reported poor energy, feelings of helplessness, and loss of interest in her hobbies. *Id.* She indicated she experienced anxiety while driving and riding in a car and when her husband raised his voice to her. *Id.* Dr. Moody observed Plaintiff to be oriented; to have normal speech; to demonstrate normal affect; to have logical thought processes; to appear to be of average intelligence; to have fair concentration; and to demonstrate adequate memory during examination, but to have difficulty with delayed recall on the Folstein Mini-Mental Status Exam. Tr. at 310. She indicated Plaintiff appeared to be exaggerating some symptoms based on her score of 6/15 on Rey's 15-Item Malingering Scale, which was consistent with a strong possibility of malingering. Tr. at 311. Dr. Moody stated the following:

> She seems rather manipulative and after the interview she stood up to leave and suddenly sat back down as if she were dizzy. The examiner did not acknowledge this so she continued to sit and stare and commented that this is what happens every day. She also reported that she feels withdrawn at times, yet she still attends church and a study group. She may be exaggerating some symptoms.

*Id.* Her diagnostic impression was "Consider Mood Disorder Due to Stroke" and she assessed a Global Assessment of Functioning ("GAF")[3] score of 56.[4] *Id.*

---

[3] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision, Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

On October 22, 2012, state agency consultant Xanthia Harkness, Ph. D. ("Dr. Harkness"), reviewed the record and completed a psychiatric review technique form ("PRTF"). Tr. at 128–29. She considered Listing 12.04 for affective disorders and assessed Plaintiff as having mild restriction of activities of daily living ("ADLs"), mild difficulties in maintaining social functioning, concentration, persistence, or pace. *Id.* She considered Dr. Moody's report and Plaintiff's function report and found that her symptoms imposed "only minimal limitations on her ability to carry out basic work activities." Tr. at 129. State agency consultant Kevin King, Ph. D, assessed the same level of restriction on February 11, 2013. Tr. at 142–44.

On October 30, 2012, Debra A. King, Ph. D., LPC, LPCS, NCC ("Dr. King"), sent a letter thanking attorney Les Shayne for referring Plaintiff for an evaluation. Tr. at 313–20. She indicated that she felt Plaintiff had been disabled since her last date of employment. Tr. at 313. She stated she had examined Plaintiff during sessions on September 7, 20, and 27, 2012. *Id.* She indicated Plaintiff became tired as the sessions progressed and that her ability to participate decreased as she became more tired. *Id.* Dr. King stated she believed Plaintiff to be validly reporting her condition. Tr. at 314. She indicated Plaintiff would have difficulty concentrating to perform a job; would require frequent breaks; would need support in completing tasks; and would miss a considerable amount of work. *Id.* She stated Plaintiff would have difficulty working around people, taking orders from superiors, and completing tasks in a timely manner. *Id.* Dr. King

---

[4] A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV-TR*.

diagnosed post-traumatic stress disorder ("PTSD"), dysthymia, and depression. Tr. at 315. She indicated Plaintiff's GAF score to be 50.[5] *Id.* She stated Plaintiff's score on the Social Readjustment Rating Scale indicated a strong likelihood that she would develop more physical and emotional problems if she did not increase her stress management skills. Tr. at 315–16. Plaintiff's score on the Response to Stress Survey suggested she did not respond well to stress and her responses to the Self-Esteem Inventory indicated she had low self-esteem. Tr. at 316. Dr. King completed a PRTF on November 19, 2012. Tr. at 321–34. She indicated her impressions were applicable for the period from September 7, 2012, to the present. Tr. at 321. She stated Plaintiff's impairment met Listing 12.04 for affective disorders. *Id.* She identified Plaintiff's depressive symptoms anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. Tr. at 325. She assessed Plaintiff to have extreme restriction of ADLs; extreme difficulties in maintaining social functioning; extreme difficulties in maintaining concentration, persistence, or pace; and four or more repeated episodes of decompensation, each of extended duration. Tr. at 330.

On January 14, 2013, Plaintiff reported no recent seizures, but complained of knee pain, weakness, fatigue, and decreased activity. Tr. at 335. Dr. Baxley observed Plaintiff

---

[5] *DSM-IV-TR* explains that a GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)."

to have 4- strength, hand grasp weakness, stiff gait, and brisk deep tendon reflexes. Tr. at 336. He noted Plaintiff had a "very stiff gait with suspicious cervical myelopathy." *Id.* He stated it was "unfortunate" that Plaintiff had been turned down for disability because "she [periodically] is excessively sleepy during the day." *Id.*

Plaintiff presented to Dr. McGeorge for persistent right knee pain on January 14, 2013. Tr. at 392. She indicated she received some temporary relief from a steroid shot, but continued to develop swelling when she walked. *Id.* Dr. McGeorge observed Plaintiff's right leg to be noticeably larger than her left. *Id.* He also noted that she had pitting edema and adductor canal and calf pain on the right. *Id.* He suspected Plaintiff had either a plica or internal derangement, but indicated a need to rule out deep venous thrombosis ("DVT") before proceeding with other treatment. *Id.* An ultrasound revealed no DVT in Plaintiff's right lower extremity. Tr. at 391.

On January 21, 2013, Plaintiff continued to report right knee pain. Tr. at 390. Dr. McGeorge indicated he suspected Plaintiff had either a plica or internal derangement and stated he would schedule her for surgery. *Id.*

Plaintiff presented to Emmitt Carter, PA-C ("Mr. Carter"), for a preoperative examination on February 5, 2013. Tr. at 385–87. Mr. Carter observed Plaintiff to have 1+ edema in her right knee, but to have no redness, warmth, or ecchymosis. Tr. at 386. He indicated Plaintiff's range of motion ("ROM") was full and unencumbered, but that she was tender to palpation along her medial and lateral joint lines. *Id.* Plaintiff demonstrated no laxity when Mr. Carter stressed her cruciate and collateral ligaments. *Id.* She was

neurovascularly intact in her right lower extremity. *Id.* Mr. Carter explained to Plaintiff the risks and benefits of surgery. Tr. at 387.

Dr. McGeorge performed operative right knee arthroscopy on February 7, 2013, that revealed Plaintiff to have a plica. Tr. at 384. The next day, Plaintiff appeared to be improving and had no gross effusion to her knee. Tr. at 383. Plaintiff reported "almost no pain" on February 12, 2013. Tr. at 382. Dr. McGeorge indicated Plaintiff had good ROM and that ecchymosis was resolving in the posterior aspect of her knee. *Id.* On February 26, 2013, Plaintiff again reported "almost no pain in her knee." Tr. at 381. Dr. McGeorge observed her to arise from a chair without using her arms and to squat down to 90 degrees without a problem. *Id.* He instructed Plaintiff to increase her activity level and to follow up in three weeks. *Id.*

On March 5, 2013, an MRI of Plaintiff's cervical spine revealed a very large central/right paracentral disc height at C5-6 that caused severe spinal stenosis and cord compression. Tr. at 377. Plaintiff had trace cord edema. *Id.* The disc was "slightly more pronounced to the right side," where there was "considerable attenuation of the left and right C6 nerve roots." *Id.* It also showed a prominent central disc height at C6-7 with upward extrusion of disc material behind the C6 vertebral body that caused cord compression and spinal stenosis, but no cord edema. *Id.* There was moderate crowding of the left and right C7 nerve roots at the nerve root foramen that was slightly greater on the right side. *Id.* The MRI further revealed a mild central disc bulge at C4-5. *Id.*

Plaintiff consulted with Larry S. Davidson ("Dr. Davidson"), on March 7, 2013. Tr. at 374–75. Dr. Davidson observed Plaintiff to have 4-/5 grip strength, but to have

normal mental status, no sensory deficits to light touch, and normal motor strength throughout the upper and lower extremities. Tr. at 375. He indicated Plaintiff had grossly normal gait and symmetric reflexes. *Id.* He reviewed Plaintiff's MRI and assessed cervical myelopathy. Tr. at 373. He recommended Plaintiff undergo anterior cervical decompression with fusion. *Id.*

On March 19, 2013, Dr. McGeorge indicated Plaintiff was having a recurrence of knee pain and stated that it may be coming from her cervical myelopathy. Tr. at 380. He administered a steroid injection to Plaintiff's right knee. *Id.*

Plaintiff visited Philip J. Hodge, M.D. ("Dr. Hodge"), for a second opinion on April 15, 2013. Tr. at 359. She assessed her pain as a six on a 10-point scale and described it as starting on the right side of her neck and moving down her arms, through the right side of her spine, and into her right leg. *Id.* Dr. Hodge observed Plaintiff to have difficulty with tandem walk, 3+ reflexes, and numbness on her right side, but indicated she had 5/5 strength in her upper and lower extremities and that her mental status was normal. *Id.* He reviewed the MRI of Plaintiff's cervical spine and indicated he felt that Plaintiff needed C6 corpectomy to prevent further disability. Tr. at 360.

Plaintiff rated her neck pain as a nine on a 10-point scale on June 6, 2013. Tr. at 356. Dr. Hodge indicated Plaintiff had normal mental status, memory, cognition and capacity for sustained mental activity. *Id.* He indicated she was unable to perform the tandem walk, but observed her to have 5/5 strength in upper and lower extremities. *Id.* He stated Plaintiff had 3+ reflexes and numbness on her right side. *Id.* He assessed cervical

stenosis and cervical myelopathy and discussed the risks and benefits of C6 corpectomy with Plaintiff. Tr. at 357.

Dr. Hodge performed C6 corpectomy; placement of allograft at the C6 vertebral space; anterior arthrodesis and fusion from C5 to C7; placement of an intervertebral prosthetic device from C5 to C7, and anterior plate fixation from C5 to C7 on June 21, 2013. Tr. at 363–64.

Plaintiff reported tingling and numbness from her right arm through her fingers and rated her pain as a five on a 10-point scale on July 2, 2013. Tr. at 353. Dr. Hodge observed Plaintiff to have 4+/5 grip strength, but to have normal mental status, coordination, gait, and station. *Id.* He stated Plaintiff's hoarseness, swallowing, leg swelling, and coordination were improving and that her grip strength would improve with time. *Id.*

Plaintiff presented to Sarah E. Peterson, M.D. ("Dr. Peterson"), to establish treatment on July 12, 2013. Tr. at 408. She reported a history of seizures that were well-controlled on Lamictal and with taking a nap every afternoon. *Id.* She indicated she had not had a seizure in over a year. *Id.* She denied difficulties with sleep, concentration, racing thoughts, confusion, memory loss, and suicidal thoughts, but endorsed feeling depressed. Tr. at 409. Dr. Peterson indicated a mental status exam was normal and that Plaintiff looked well and did not appear to be in pain. Tr. at 410. She observed Plaintiff to have no lower extremity edema. *Id.* She assessed chronic malaise and fatigue, depression, epilepsy, and hypertension, but noted that all of Plaintiff's impairments other than

depression were controlled. Tr. at 410–11. She increased Plaintiff's dosage of Prozac to 20 milligrams and refilled her other medications. Tr. at 411.

On July 30, 2013, Plaintiff reported to Dr. Hodge that the tingling and numbness in her right arm had resolved. Tr. at 350. Dr. Hodge observed Plaintiff to have normal, gait, station, coordination and mental status. *Id.*

Plaintiff presented to Dr. Peterson for a gynecological examination on August 12, 2013. Tr. at 403. She reported that she was doing well and that her neck pain and depressive symptoms had improved. *Id.*

On September 10, 2013, Plaintiff reported her neck pain to be a six on a 10-point scale. Tr. at 347. She endorsed numbness from her fingers to her elbow. *Id.* Dr. Hodge indicated Plaintiff was stumbling occasionally, but had normal mental status. *Id.* He continued Plaintiff's medications and instructed her to follow up in three months. Tr. at 348.

Plaintiff followed up with Dr. Hodge regarding numbness in her right arm on December 10, 2013. Tr. at 344. She denied being in pain. *Id.* Dr. Hodge observed Plaintiff to have a normal gait and normal mental status. *Id.* He instructed her to follow up again in three months. *Id.*

Plaintiff presented to Dr. Peterson on January 8, 2014, with complaints of dizziness and pressure, pain, and throbbing in her ears. Tr. at 399. Dr. Peterson observed no abnormalities on examination. Tr. at 400. She referred Plaintiff to an ear, nose, and throat specialist and prescribed Oxybutynin ER for chronic urinary incontinence. *Id.*

On February 17, 2014, Plaintiff reported experiencing urinary incontinence and occasional dizzy spells that lasted for approximately five minutes at a time. Tr. at 395. She indicated the dizziness was accompanied by neck stiffness. *Id.* Dr. Peterson indicated Plaintiff "[a]ppears healthy, [l]ooks well," and "[d]oes not appear to be in pain." Tr. at 396. She described Plaintiff's mental status as normal. *Id.* She increased Plaintiff's dosage of Oxybutynin ER for incontinence. Tr. at 397. She stated Plaintiff's dizziness appeared to be benign, but she offered a prescription for Antivert that Plaintiff declined. *Id.*

On March 10, 2014, Plaintiff followed up with Dr. Hodge regarding numbness in her right arm and pain in her right leg. Tr. at 423. Dr. Hodge observed Plaintiff to have normal gait, normal mental status, and 3+ reflexes. Tr. at 424. He prescribed Meclizine for dizziness. Tr. at 425.

### 3.    Non-Medical Evidence

On February 14, 2014, Sheri Beaty ("Ms. Beaty"), indicated she had known Plaintiff for four years and that Plaintiff's health had declined over time. *Id.* She stated Plaintiff tired easily while walking and had to stop to rest. *Id.* She denied having witnessed Plaintiff's seizures, but indicated she understood that Plaintiff had to lie down each day to prevent them. *Id.* She described Plaintiff as sometimes staring into space and declining to participate in conversation. *Id.* She indicated Plaintiff continued to have difficulty with walking and climbing. *Id.*

On February 17, 2014, Pat Wilson ("Ms. Wilson"), indicated she had known Plaintiff for two-and-a-half years. Tr. at 264. She indicated Plaintiff no longer attended

her church, but that they continued to be friends. *Id.* She described Plaintiff as stumbling and falling a lot, becoming tired easily, having difficulty focusing, and having problems with her back and hips. *Id.* She observed Plaintiff to have difficulty standing in church and participating in the choir during the time that they attended the same church. *Id.* She stated she sometimes drove Plaintiff to doctor's visits. *Id.* She indicated she was worried by Plaintiff's depression and weight loss. *Id.* She stated Plaintiff continued to drag her right foot and to stumble following her surgery. *Id.*

On February 25, 2014, Plaintiff's mother Sandra Howington ("Ms. Howington"), described Plaintiff as being unable to walk, drive, or speak clearly; becoming tired easily; and sleeping for long periods following her stroke. Tr. at 268. She stated Plaintiff's speech had improved, but that she continued to have difficulty walking. *Id.* She indicated she sometimes picked up Plaintiff to take her shopping and that she had witnessed incidents in which Plaintiff stared and did not speak. *Id.* She recalled that Plaintiff's falls increased before she had the MRI of her neck. *Id.* She stated Plaintiff had improved after the surgery, but continued to drop items and to drag her foot to the point of stumbling. *Id.*

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on March 17, 2014, Plaintiff testified she lived with her husband, who was disabled. Tr. at 529–30. She stated she stopped working in August 2007, following a mini-stroke. Tr. at 530.

16

Plaintiff testified that her memory had improved since the last hearing, but she indicated she continued to have some minor memory problems. Tr. at 537. She stated she occasionally stumbled when she walked, but she denied having fallen. *Id.* She endorsed pain in her low back, right knee, and right ankle. *Id.* She stated she experienced an intense migraine headache once a month. Tr. at 538. She indicated her speech and ability to walk had improved. Tr. at 539. She confirmed that she had experienced seizures approximately every year to year-and-a-half prior to her 2012 hearing and indicated she had not experienced a seizure since the last hearing. Tr. at 540. She endorsed symptoms of depression that were worsened by her inability to be as active as she would like to be and symptoms of anxiety that were exacerbated by driving. Tr. at 542. She stated she lacked motivation, had difficulty completing tasks, experienced crying spells, and felt lethargic. Tr. at 557.

Although Plaintiff indicated she had not recently had a grand mal seizure, she indicated she experienced tremors a couple times a day that caused her to stare into space and prevented her from speaking. Tr. at 545. She stated she took Ativan when she experienced the tremors and indicated the Ativan caused her to be "out for at least eight hours." Tr. at 546. Upon further questioning from the ALJ, Plaintiff admitted to taking the Ativan once a month. Tr. at 547.

Plaintiff testified she had not seen Dr. Baxley in a year because he indicated he could offer nothing further to improve her condition. Tr. at 548. She stated Dr. Peterson was continuing to prescribe the medications that Dr. Baxley had initially prescribed. Tr. at 548–49. She indicated Dr. Baxley had suggested she obtain an MRI after he observed

17

her to have an abnormal gait, but that she had to wait to obtain a referral for the MRI from the clinic where she received her primary care. Tr. at 549. She testified it took her three to four months to obtain an appointment and additional time to obtain the money to pay for the MRI. Tr. at 549–50. She indicated that within two days of receiving the MRI report, Dr. Baxley referred her to spinal specialists, who recommended surgery. Tr. at 550–51. She confirmed that she underwent neck surgery in June 2013. Tr. at 551. Plaintiff stated the swelling in her right leg decreased; her balance improved; and she no longer required the use of a cane after the surgery. Tr. at 551–52.

Plaintiff testified that the surgery did not improve the pain in her right leg or the pain, numbness, and tingling in her right arm and hand. Tr. at 552. She indicated she had noticed some improvement in the grip strength in her left hand, but that she continued to be limited in her ability to repetitive use and lift with her left hand. Tr. at 552, 553. She confirmed that her left hand was her dominant hand. Tr. at 553. She stated she had limited mobility in her cervical spine. *Id.* She testified she was unable to fasten buttons. Tr. at 560–61.

Plaintiff indicated she experienced urinary frequency and urgency. Tr. at 557. She stated she had to use the restroom every hour to hour-and-a-half. *Id.* She endorsed difficulty with depth-perception and vision in her left eye. Tr. at 558–59.

Plaintiff testified she could sit for 30 minutes, stand for 45 minutes, and walk up to 150 feet. Tr. at 543. She stated she could lift five pounds on a regular basis. *Id.* She indicated she had difficulty bending over and climbing stairs. Tr. at 543–44.

Plaintiff testified she volunteered at a food bank once every other month, visited her mother once a month, attended a prayer group once a week, and attended church once a week. Tr. at 534. She indicated she watched television throughout the day and read for approximately two hours daily. *Id.* She stated she had reduced her reading time from four to two hours daily because bending her neck caused increased pain. Tr. at 534–35. She testified she cooked, did laundry, washed dishes, made beds, vacuumed, mopped, swept, dusted, and shopped for groceries with her husband. Tr. at 535. Plaintiff acknowledged that she had testified in the prior hearing that she engaged in quilting for four hours per day, but she indicated she was no longer able to engage in quilting because she had difficulty using her hands and bending her neck. Tr. at 535–36. She stated she drove once a week. Tr. at 536. She indicated she took a daily nap that lasted from 30 minutes to an hour-and-a-half. Tr. at 540. She stated she was either too depressed or too tired to leave her house on three or four days per week. Tr. at 563–64.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Roy Sumpter reviewed the record and testified at the hearing. Tr. at 568–578. The VE categorized Plaintiff's PRW as a medical billing clerk, *Dictionary of Occupational Titles* ("*DOT*") number 214.362-022, as sedentary in exertion with a specific vocational preparation ("SVP") of five; a hospital admissions clerk, *DOT* number 205.362-018, as sedentary with an SVP of four; a retail sales clerk, *DOT* number 290.477-014, as light with SVPs of three and four; a bookkeeper, *DOT* number 210.382-014, as sedentary with an SVP of six; a CNA, *DOT* number 355.674-014, as medium with an SVP of four; and a motel clerk, *DOT* number 238.367-038, as light with an SVP

of four. Tr. at 569–70. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work with the following limitations: sit, stand, and walk for a combined total of eight hours with the ability to change positions every 30 minutes to one hour; never climb ladders; occasionally climb ramps and stairs and perform all other postural activities; and must avoid concentrated exposure to hazards. Tr. at 570–71. The ALJ further indicated the individual would be limited to jobs with an SVP no higher than four because of problems with concentration and focus. Tr. at 571. The VE testified that the hypothetical individual could perform Plaintiff's PRW as a hotel clerk. Tr. at 573. The ALJ asked whether there were any unskilled jobs in the regional or national economy that the hypothetical person could perform. Tr. at 575. The VE identified jobs as a cashier II, *DOT* number 211.462-010, with 3,500,000 positions nationally and 61,000 positions in South Carolina; a storage facility rental clerk, *DOT* number 295.367-026, with 442,000 positions nationally and 5,000 positions in South Carolina; and a final inspector, *DOT* number 727.687-054, with 250,000 positions nationally and 5,000 positions in South Carolina. Tr. at 575–76.

Plaintiff's attorney asked the VE to assume the hypothetical individual could only use her dominant hand occasionally and her non-dominant hand less than occasionally. Tr. at 576. The VE testified that the individual would be able to perform no work. Tr. at 577.

Plaintiff's attorney asked the VE to assume the hypothetical individual would be unable to move her neck to the left or right or look down on more than an occasional

basis. *Id.* The VE responded that the limitation would be incompatible with competitive employment. *Id.*

Plaintiff's attorney asked the VE to assume the hypothetical individual's productivity would be reduced by 20 percent in comparison to other employees. Tr. at 578. The VE indicated the limitation would be incompatible with competitive employment. *Id.*

Plaintiff's attorney asked the VE to assume the hypothetical individual would need to be permitted to leave the work station on an immediate basis every hour-and-a-half. *Id.* The VE indicated the individual would not be able to maintain the jobs identified in response to the previous question. *Id.*

Plaintiff's attorney asked the VE to assume the individual would need to lie down to rest for an hour per day. *Id.* The VE stated the individual would be unable to perform the identified jobs. *Id.*

Plaintiff's attorney asked the VE to assume the individual would miss three days of work per month on an unexpected basis. *Id.* The VE indicated the individual would be unable to sustain any of the identified jobs. *Id.*

### 2.    The ALJ's Findings

In his decision dated September 18, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.
2.    The claimant has not engaged in substantial gainful activity since August 4, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: cervical degenerative disc disease (DDD) with surgery, osteoarthritis, and epilepsy (20 CFR 404.1520(c) and 416.920(c).

4.    The claimant also has the following non-severe impairments: anxiety, depression, staring seizure, memory impairment, hypertension, vertigo and urinary incontinence (20 CFR 404.1521 and 416.921).

5.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). In particular, the claimant can lift or carry up to 20 pounds occasionally and 10 pounds frequently. She can stand or walk for approximately 6 hours of an 8-hour workday with normal breaks. However, the claimant must be able to change positions every thirty minutes to one hour. The claimant is limited to work with no ladders, occasional climbing of ramps or stairs, and occasional balancing, stooping, crouching, or crawling. She must avoid concentrated exposure to hazards. Secondary to the claimant's mild concentration issues, she is limited to work of SVP 4.

7.    The claimant is capable of performing past relevant work as a hotel clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

8.    The claimant was born on June 18, 1966 and was 46 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11.    Considering the claimant's age, education work experience, and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that the claimant also can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

12.    The claimant has not been under a disability, as defined in the Social Security Act, from August 4, 2012, through the date of the decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. at 29–41.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ provided no explanation in support of her decision to deny Plaintiff's motion to reopen the prior claim;

2)    the ALJ failed to include evidence in the record and based her decision on an incomplete record;

3)    the ALJ neglected to consider several of Plaintiff's impairments to be severe; and

4)    the ALJ did not adequately assess Plaintiff's credibility and failed to provide an RFC assessment that reflected all of her limitations.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series

of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[6] (4) whether such impairment prevents claimant from performing PRW;[7] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520 and 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[6] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525 and 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526 and 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[7] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's PRW to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h) and 416.920(h).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See*

*Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Reopening of Prior Application

Plaintiff filed applications for DIB and SSI on October 27, 2010. Tr. at 84. On August 2, 2012, ALJ Jordan issued an unfavorable decision finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 81–122.

In a letter dated March 11, 2014, Plaintiff amended her alleged onset date to May 29, 2012, and requested that the ALJ reopen the October 27, 2010 application and revise

the August 2, 2012 decision. Tr. at 192. She claimed that new and material evidence supported a finding of disability as of her amended alleged onset date. *Id.* She cited a May 29, 2012 treatment note that documented her complaints of increased falls and difficulty with her right knee and discussed MRI results that showed an old infarct on her brain; a June 25, 2012 evaluation of her knee; an April 9, 2012 treatment note; evidence of cervical myelopathy dating back to November 3, 2011; and an October 2012 consultative examination with Dr. Moody. Tr. at 192–93.

Plaintiff argues the ALJ ignored her request to reopen the prior decision denying her claim. [ECF No. 11 at 29–30]. She maintains the ALJ did not address the letter in which her attorney argued that new and material evidence supported the prior claim's reopening. *Id.*

The Commissioner argues the ALJ was not required to reopen Plaintiff's prior application for benefits. [ECF No. 17 at 16]. She maintains the ALJ adequately explained that Plaintiff failed to present new and material evidence that pertained to the previously-adjudicated period. *Id.* She contends Plaintiff has not shown that the ALJ would have reached a different conclusion regarding her disability status if she had reopened the prior application. *Id.* at 16–17.

An adjudicator must consider a prior agency finding as evidence and must consider the following in determining the appropriate weight to give it:

(1)    whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition;

27

(2)    the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and

(3)    the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

Social Security Acquiescence Ruling ("AR") 00-1(4) (interpreting *Albright v. Commissioner of the Social Security Administration*, 174 F.3d 473 (4th Cir. 1999)). The regulations provide that the Social Security Administration ("SSA") will find good cause to reopen a determination or decision if (1) new and material evidence is furnished; (2) a clerical error in the computation or recomputation of benefits was made; or (3) the evidence that was considered in making the determination or decision clearly shows on its face that an error was made. 20 C.F.R. §§ 404.989(a) and 416.1489(a).

"As a general rule, federal courts lack jurisdiction to review a decision by the [Commissioner] not to reopen a previous claim for benefits." *Kasey v. Sullivan*, 3 F.3d 75, 78 (4th Cir. 1993), citing *Califano v. Sanders*, 430 U.S. 99, 107–09 (1977). In *Califano*, the Supreme Court held that district courts lacked subject matter jurisdiction to review the Commissioner's refusal to reopen claims for disability benefits unless the claimant challenged the refusal on constitutional grounds. Nevertheless, the Fourth Circuit has recognized an exception to the general rule "when a claim that otherwise would be barred by *res judicata* has been, in effect, reconsidered on the merits at the administrative level," pursuant to 20 C.F.R. § 404.989. *Kasey*, 3 F.3d at 78, citing *McGowen v. Harris*, 666 F.2d 60, 65–66 (4th Cir. 1981). The Commissioner "must be afforded some leeway in making a decision whether to reopen, so that it may 'in fairness

look far enough into the proffered factual and legal support to determine whether it is the same claim.'" *Hall v. Chater*, 52 F.3d 518, 521 (4th Cir. 1995), citing *McGowen*, 666 F.3d at 67. Pertinent to the instant case, "[e]ven if the plaintiff's submitted evidence was new and material, the administrative law judge has the discretion not to reopen the decision and any alleged failing in that regard is unreviewable." *Jackson v. Astrue*, No. 2:08-176-TLW-RSC, 2009 WL 394314, at *7 (D.S.C. Feb. 13, 2009). If the Commissioner's "application of res judicata was legally correct, and if the original claim was not administratively reopened by reconsidering it on the merits," the court lacks subject matter jurisdiction to review the ALJ's decision to deny reopening of the prior claim." *McGowen*, 666 F.2d at 66.

The ALJ wrote the following regarding Plaintiff's request to reopen the prior application:

> In the case at hand, the claimant was found "not disabled" through August 2, 2012, based on [her] applications filed on October 27, 2010. The claimant did not appeal the decision, but filed a new application on August 29, 2012 under the same title, based on the same facts alleging that [s]he became disabled on August 4, 2012, later amended to May 29, 2012. However, since the period through August 4, 2012, was previously adjudicated, the findings made in the prior decision were made administratively final and binding through the date of that decision. The claimant has not presented new and material evidence that would alter the findings pertaining to the previously adjudicated period. Therefore, res judicata effect is given to the findings pertaining to the period through the date of the prior decision.

Tr. at 27. The ALJ further noted that she gave great weight to her previous findings because "the previously adjudicated period is close in time to the period now being adjudicated." *Id.* She indicated that any evidence discussed for the period prior to August

4, 2012, was "for background purposes only and should not be construed as implied reopening." *Id.*

Plaintiff asserts no constitutional ground for reopening her claim. *See Califano*, 430 U.S. at 107–09. Therefore, the court looks only to whether the ALJ's decision to deny Plaintiff's motion to reopen the prior claim was legally correct and whether she constructively reopened the prior claim. *See Kasey*, 3 F.3d at 78; *McGowen*, 666 F.2d at 65–66. The ALJ considered the factors under AR 00-1(4) in discussing the weight she accorded to her prior decision, noting that Plaintiff had "not presented new and material evidence that would alter the findings pertaining to the previously adjudicated period" and that the current period being adjudicated was "close in time" to the previously-adjudicated period. *See* Tr. at 27; *see also* AR 00-1(4) ("Where the prior finding was about a fact which is subject to change with the passage of time, such as a claimant's residual functional capacity, or that a claimant does not does not have an impairment(s) which is severe, the likelihood that such fact has changed generally increases as the interval of time between the previously adjudicated period and the period being adjudicated increases. An adjudicator should give greater weight to such a prior finding when the previously adjudicated period is close in time to the period being adjudicated in the subsequent claim . . . ."). She explicitly stated that she did not intend to constructively reopen the prior claim. *Id.*

Plaintiff had the opportunity to appeal the ALJ's August 2, 2012 decision within 60 days of that decision, but she declined to do so and, instead, filed a new claim for benefits. In *Califano*, the court stated that "an interpretation that would allow a claimant

judicial review simply by filing and being denied a petition to reopen his claim would frustrate the congressional purpose, plainly evidenced in § 205(g) [of the Social Security Act], to impose a 60-day limitation upon judicial review of the [Commissioner's] final decision on the initial claim for benefits." *Califano*, 430 U.S. 99, 108.

It appears the ALJ considered her prior decision based on the appropriate legal factors and explicitly denied that she was constructively reopening the prior claim. Therefore, the undersigned recommends a finding that the court lacks jurisdiction to review her decision to deny Plaintiff's motion to reopen the prior claim.

### 2.    Exclusion of Evidence

Plaintiff argues the ALJ excluded records that pertained to her prior application[8] from the current record, despite her indication during the hearing that she would include

---

[8] All of the records at issue were included as exhibits and most were discussed in the ALJ's August 2, 2012 decision. Records and an RFC assessment from Dr. Baxley for the period from August 22, 2011, through November 3, 2011, were included in the prior record at exhibits 11F, 12F, and 16F. Tr. at 121–22. The ALJ specifically addressed these records and Dr. Baxley's opinion in her August 2012 decision. *See* Tr. at 93, 94, 96, 97, 110, and 113. Records and a report from Michael J. Ezell, D.C. ("Dr. Ezell"), for the period from November 19, 2011, through April 26, 2012, were included in the prior record at exhibits 18F and 25F. Tr. at 122. The ALJ also addressed Dr. Ezell's records and opinion in the August 2012 decision. *See* Tr. at 93, 94, 95, 96, 110, and 112–13. A counseling report and records from Wes Lothery, M. Ed., LPC ("Mr. Lothery"), for the period from March 9, 2011, through April 30, 2012, were included in the prior record at exhibits 19F and 26F. Tr. at 122. The ALJ specifically discussed Mr. Lothery's records and opinion in the August 2012 decision. *See* Tr. at 97, 106, and 112. A "Claimant's Work Background" form was included in the prior record at exhibit 24E. Tr. at 120. The disabled parking placard for the period from July 25, 2011, through June 18, 2015, was included in the prior record at exhibit 26E. *Id.* The lay witness statements of Ms. Howington (dated April 2, 2012), Ms. Beaty (dated April 4, 2012), Ms. Wilson (dated April 5, 2012), Patricia Spielman ("Ms. Spielman") (dated April 5, 2012), and Robert DelMarco ("Mr. DelMarco") (dated April 9, 2012), were included in the prior record at

this evidence. [ECF Nos. 11 at 25–28 and 19 at 2]. She maintains the ALJ did not reference the evidence or explain her reasons for excluding it. *Id.* at 28. She further contends that because the ALJ's decision had no attached list of exhibits, it was not clear that the evidence was not included in the record until the transcript was filed with the court. *Id.* at 28–29. She argues that evidence from a prior claims file must be considered when the pending claim involves a possible reopening or res judicata issue. [ECF No. 19 at 6]. Plaintiff has moved to admit the evidence the ALJ failed to include [ECF No. 13], and has attached the evidence to her motion as exhibits.[9]

---

exhibits 19E, 20E, 21E, 22E, and 23E, respectively. *Id.* The ALJ weighed the opinions of all these lay witnesses in her prior decision. *See* Tr. at 110, 113, and 114–15.

[9] The evidence Plaintiff sought to admit included the following: a form labeled "Claimant's Work Background" that reflects her employment from 1997 through August 2007. [ECF No. 13-4 at 2–3]; notes from therapy sessions with Mr. Lothery on March 9, 16, 23 and 30, April 13, 27, and 28, and May 18, 2011 [ECF No. 13-3 at 5–10]; a letter from Mr. Lothery dated May 13, 2011, in which he described Plaintiff's diagnoses and symptoms and stated "[c]hildhood trauma, as well as physical problems have negatively affected [Plaintiff's] life to the extent that she is unable to get a job and perform expectantly" [ECF No. 13-3 at 4]; a disabled placard from South Carolina Department of Motor Vehicles issued on July 25, 2011, and valid through June 18, 2015 [ECF No. 13-5 at 2]; a letter from Dr. Baxley dated August 22, 2011, that discussed Plaintiff's treatment history, diagnoses, symptoms, and limitations [ECF No. 13-1 at 2]; an RFC form completed by Dr. Baxley on August 29, 2011 [ECF No. 13-1 at 4–7]; chiropractic treatment notes from Dr. Ezell dated November 19, 21, 23, 28, and 30 and December 7, 14, and 23, 2011 and January 3, 9, 13, 17, 24, and 31, February 6 and 21, March 5 and 20, and April 10, 2012 [ECF No.13-2 at 5–9]; letters dated between April 2 and 9, 2012, from Ms. Howington, Ms. Beaty, Ms. Wilson, Ms. Spielman, and Mr. DelMarco that describe Plaintiff as having an unsteady gait, tiring easily; staring into space and failing to engage in conversation at times; being unable to drive long distances; and having a limited ability to engage in activities she once enjoyed [ECF Nos. 13-6, 13-7, 13-8, 13-9, 13-10]; a letter from Mr. Lothery dated April 12, 2012, that suggested Plaintiff was eligible for disability based on his assessment of PTSD and dysthymia [ECF No. 13-3 at 3]; and a letter from Dr. Ezell dated April 26, 2012, that indicated Plaintiff's impairments had improved with treatment, but that she remained unable to stand for more than one hour during an eight-hour day; sit for longer than two hours in a day; lift five pounds

The Commissioner argues the ALJ appropriately applied administrative res judicata in excluding the evidence from Plaintiff's prior claim. [ECF No. 17 at 14]. She maintains an ALJ is not required to include evidence from an earlier claim file in a later claim file, but must include the prior ALJ's decision. *Id.* at 15. She argues ALJs are only required to include exhibits from a prior application in limited circumstances and that Plaintiff has not demonstrated that the records she sought to have admitted were material. *Id.* at 15–16.

On March 11, 2014, Plaintiff's attorney attempted to submit the evidence and alleged it "to be material and relevant to the current claim to (1) further justify reopening and revising the decision in the prior claim, and (2) [for] documenting the long-standing nature of Ms. Webb's medical problems and treatment, and difficulties she has continued to experience." Tr. at 193.

During the hearing the following exchange took place between Plaintiff's attorney and the ALJ:

> ALJ:       I also heard—the reporter told me that you had a question about the prior files and the desire to have those made a part of these, oh, evidence submitted, the prior decision and all that. It appears that's in—part of it in the file and, of course, we used—the files are here, you know, from the last two or three hearings.
>
> ATTY:      And—
>
> ALJ:       And so I do review those as well. In fact, what I'll be using, to save a little time today, is my own hearing notes from last

more than a few times per hour; and would need to rest for a combined total of at least two hours during the day [ECF No. 13-2 at 2].

> time that have been marked with changes and things that have
> happened since then.

ATTY:       Excellent, okay.

Tr. at 515–16. The ALJ indicated exhibiting the records at issue was complicated by the

fact that the prior file was in electronic format, but the current file was in paper format.

Tr. at 516. She stated she could review the prior records "in medical on documents." *Id.*

Plaintiff's attorney asked if the ALJ could review the entire prior file, and the ALJ

confirmed that she could. *Id.* The following exchange then took place:

ATTY:       But anyway—but, so, as long as the evidence that I submitted
            from last week from the—

ALJ:        Yes.

ATTY:       —prior claim, as long as that is going to be part of the record
            on this case, I—

ALJ:        And it is, as well as—

ATTY:       Yes.

ALJ:        —I'll have this one put in and I'll take a brief look at that—

ATTY:       Right.

ALJ:        —as well.

ATTY:       Great. Thank you very much, Your Honor.

Tr. at 516–17. The ALJ indicated she would take the evidence back to her desk and

would thoroughly review it before she made a decision. Tr. at 517. She noted that the

staff had likely stopped putting the records from Plaintiff's prior claim in the new file

because it was a paper file "and they said that's duplicate work and we're short of help

34

anyway, so we haven't got time to put them in both places." Tr. at 518. However, she noted she could "open and look at any of her files that are in here." *Id.*

The undersigned first addresses Plaintiff's argument under the regulations. Pursuant to 20 C.F.R. §§ 404.1512(d) and 416.912(d), the SSA cannot determine that a claimant is not disabled without first developing the claimant's medical history for at least the 12 months preceding the month in which the claimant filed her application. However, if the claimant alleges her disability began less than 12 months before she filed her application, the SSA is only required to develop her medical history beginning with the month she said her disability began. 20 C.F.R. §§ 404.1512(d)(2) and 416.912(d)(2). Plaintiff alleged an amended onset date of May 29, 2012. Therefore, pursuant to 20 C.F.R. §§ 404.1512(d)(2) and 416.912(d)(2), the ALJ was only required to develop Plaintiff's complete medical history for the period beginning in May 2012. The evidence that Plaintiff has presented to this court pertained to the period prior to May 2012. *See* ECF Nos. 13-1–13-10. Therefore, it does not appear that the ALJ violated the provisions of 20 C.F.R. §§ 404.1512(d)(2) and 416.912(d)(2) in declining to develop the record with respect to the evidence at issue.

Plaintiff argues that in failing to admit or discuss the evidence, the ALJ violated multiple provisions of the SSA's Hearing, Appeals, and Litigation Law Manual ("HALLEX").[10] The Fourth Circuit has provided no guidance as to whether HALLEX carries the force of law and is binding on the Commissioner, and other federal circuits

---

[10] HALLEX "defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the Hearing, Appeals Council, and Civil Action levels." HALLEX § I-1-0-1.

have issued conflicting opinions on the matter. *Mack v. Colvin*, 2014 WL 1366030, at *4 (D.S.C. Mar. 20, 2014), citing *Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000); *Bordes v. Comm'r*, 235 F. App'x 853, 859 (3d Cir. 2007); *Moore v. Apfel*, 216 F.3d 864, 868–69 (9th Cir. 2000); *Calhoun v. Astrue*, 2010 WL 297823 (W.D.V.A. Jan. 15, 2010). This court has generally adopted the position that, although HALLEX does not have the force of law, a failure to follow its procedures that results in prejudice to the claimant constitutes reversible error. *Id.*, citing *Way v. Astrue*, No. 1:10-1134-RBH, 789 F. Supp. 2d 652, 665 (D.S.C. 2011).

Although Plaintiff argues to the contrary, it does not appear that the ALJ violated the provisions of HALLEX § I-2-1-13. Pursuant to HALLEX § I-2-1-13-B-1, hearing office ("HO") staff must request a prior claim file if "[t]he pending claim involves a possible reopening and/or res judicata issue" or "[t]he ALJ must consider findings of an ALJ or the Appeals Council on a prior claim to comply with an Acquiescence Ruling." In addition, "[a]n ALJ will generally find that evidence in a prior claim(s) file is necessary" when she determines "[t]here is a need to establish a longitudinal medical, educational, or vocational history" or "[t]he impairment is of a nature that evidence from a prior folder could make a difference in establishing whether disability is present in the current claim." HALLEX § I-2-1-13-B-2. A review of the exchange between the ALJ and Plaintiff's attorney reveals that the HO staff had obtained a copy of the prior file and that it was available to the ALJ for review. *See* Tr. at 515–16.

While prior files must be requested under the above circumstances, evidence from a prior file does not have to be exhibited in a subsequent claim. *See* HALLEX § I-2-1-13-

D ("If the prior claim(s) file was not exhibited, HO staff will add to the pending claim(s) file only documents from the prior claim(s) file that will be referenced as exhibits. If the prior claim(s) file is paper and the file was exhibited, HO staff will add to the pending claim(s) file only the exhibit list, ALJ decision, and any appeal documents from the prior claim(s) file. The ALJ will then reference the relied upon information in the decision using the prior exhibit numbers.").[11] Contrary to Plaintiff's assertion, the dialogue between Plaintiff's attorney and the ALJ during the hearing does not reveal that the ALJ promised to have the records exhibited. While the ALJ indicated at one point in the interaction that the evidence from the prior claim would be made part of the record for the current case (Tr. at 517), she also indicated that the HO staff had declined to exhibit the records because they considered it to be duplicative work and that she could open the records from the prior filing and review them (Tr. at 518). The ALJ complied with the requirements of HALLEX § I-2-1-13-D in that she included the prior decision and the exhibit list from the prior file. *See* Tr. at 81–122. Thus, the ALJ did not violate the provisions of HALLEX § I-2-1-13-D in failing to have the records from the prior claim exhibited in the current claim.

Although the ALJ was not required to include the records that Plaintiff sought to admit from the prior claim in the current record, the question remains whether she was required to address them. A review of the ALJ's decision reveals no reference to the

---

[11] The undersigned notes that HALLEX § I-2-1-13-D does not address the exact situation presented in the instant case where the prior file was in electronic format and the subsequent file was in paper format. However, because the evidence at issue was exhibited in the prior case file, it appears it was most appropriate for the ALJ to add to the current case file the exhibit list and the ALJ decision from the prior claim.

evidence from the prior claim that Plaintiff sought to admit, and the absence of an exhibit list further muddies the issue. *See* Tr. at 23–45. Pursuant to HALLEX § I-2-1-20, the following procedure is required with respect to exhibiting the evidence:

> If the ALJ issues a partially favorable or unfavorable decision, HO staff must prepare the exhibit list in final form and place it in the claim(s) file. An exhibit list in final form is required when an ALJ issues less than a fully favorable decision to protect the claimant's due process rights. The claimant is entitled to know the information the ALJ relied on when making the decision. When an ALJ issues a less than fully favorable decision, preparing the exhibit list in final form is mandatory and is not a discretionary practice.

In *Alexander v. Astrue*, 2010 WL 1254945, No. 4:08-3384-HFF-TER (D.S.C. Mar. 23, 2010), the plaintiff raised the issue of an ALJ's failure to include an exhibit list with the decision. The court remanded the case because the record was incomplete and because the ALJ failed to consider evidence and to explain his assessment of that evidence. *Alexander*, 2010 WL 1254945, at *5. However, the court did not specifically address whether the failure to include an exhibit list constituted reversible error.

The Northern District of West Virginia appears to be the only court within the Fourth Circuit to have specifically addressed this issue. In two recent cases, the court held that ALJs' failures to include exhibit lists did not violate the plaintiffs' due process rights because the plaintiffs could not show prejudice. *See Pearson v. Colvin*, No. 2:14-26, 2015 WL 3757122 (N.D.W.Va. Jun. 16, 2015); *Yoakum v. Commissioner of Social Sec.*, No. 1:14-74, 2015 WL 1585745 (N.D.W.Va. Apr. 9, 2015).

Although HALLEX § I-2-1-20 indicates that inclusion of an exhibit list is mandatory to protect the claimant's due process rights, in the absence of controlling

authority on the issue, the undersigned declines to recommend blanket remand where the ALJ's decision fails to include an attached exhibit list. Instead, the undersigned considers whether Plaintiff was prejudiced by the error.

Upon first impression, HALLEX appears to present conflicting authority as to whether the ALJ was required to address the evidence from the prior claim. Pursuant to HALLEX § I-2-1-13-F, "[w]hen an ALJ relies on information from a prior claim(s) file, the ALJ will make the evidence part of the record in the pending claim, and address the evidence in the written decision," but "[a]n ALJ is not required to address evidence on which he or she does not rely." HALLEX § I-2-6-58(A) specifies that the ALJ may consider and exhibit information dated within 12 months of the claimant's onset date and evidence dated within a time period covered by a prior application that may be subject to reopening, and that she should identify the information and explain her rationale if she declines to admit it.

However, upon further evaluation, HALLEX § I-2-1-13-F and HALLEX § I-2-6-58(A) do not necessarily conflict. Because it is possible, and perhaps likely, that evidence from a prior application would predate a claimant's alleged onset date by more than 12 months or would not be pertinent to the request to reopen the prior claim, it is reasonable for the ALJ to have discretion to decline to rely on or address such evidence from a prior claim. However, where, as here, the claimant alleges that the evidence from the prior claim is pertinent to establishing a longitudinal history of complaints and treatment for an impairment within 12 months of the alleged onset date, HALLEX § I-2-6-58(A) appears to be controlling. Because the evidence would be relevant and would have to be

addressed if this were Plaintiff's first claim for benefits, the fact that the ALJ omitted the evidence without explanation appears unreasonable. In addition, the ALJ indicated during the hearing that she would consider the evidence. Tr. at 516–18.

The undersigned has considered, but rejects that the possibility ALJ might have declined to explicitly consider the evidence to avoid the appearance of an implied reopening of the prior claim. Pursuant to HALLEX § I-2-6-58-A, an ALJ may identify evidence that she declines to admit and explain her reasons for not admitting the information on the record at the hearing, in a written ruling that the ALJ exhibits, or in her decision. The ALJ discussed other evidence that pertained to the period prior to the date of the earlier decision (Tr. at 33), but did not reference the evidence at issue in her decision. She indicated that "[a]ny evidence discussed [that pertained to the time period prior to August 4, 2012]" was "for background purposes only and should not be construed as implied reopening." Tr. at 27. Therefore, it does not appear that the ALJ's failure to address the evidence resulted from a fear of having her discussion interpreted as a reopening of the prior claim because she could have discussed the evidence for background purposes, as she did with the other evidence. However, even if she were reluctant to discuss the specific evidence at issue, she could have addressed it on the record at the hearing or in a separate decision. *See* HALLEX § I-2-6-58-A. The ALJ failed to avail herself of any of these opportunities to address the evidence.

The ALJ did not reference the evidence by its exhibit numbers in the prior claim or specifically include any of the evidence in the record. *See* HALLEX § I-2-1-13-D, F. She also failed to explicitly deny Plaintiff's request to admit the evidence. *See* Tr. at 26–

41. Based on the record before the court, it is unclear whether the ALJ intentionally declined to admit the evidence or merely neglected to consider it. Therefore, the undersigned recommends the court find the ALJ's deviation from the procedures set forth in HALLEX resulted in prejudice to Plaintiff.

The undersigned further recommends the court deny Plaintiff's motion to admit new evidence because the issue of whether to admit the evidence is reserved to the ALJ on remand. *See* HALLEX § I-2-6-58(A) (indicating the ALJ may identify the information and explain her reasons for not admitting it).

### 3.    Remaining Allegations of Error

Because the undersigned has recommended the court remand the case based on the ALJ's failure to consider evidence that may be relevant to Plaintiff's current claim, the additional allegations of error are not addressed in detail. However, should the ALJ choose to admit the additional evidence pertaining to the period within 12 months of Plaintiff's alleged onset date, it may be necessary for her to reassess Plaintiff's severe impairments, credibility, and RFC.

### III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of

42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings. The undersigned further recommends the court deny Plaintiff's motion to admit new evidence [ECF No. 13].

IT IS SO RECOMMENDED.

November 1, 2016                          Shiva V. Hodges
Columbia, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).